IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DAUPHINE NUNN                                          PLAINTIFF

v.                          No. 4:04-cv-1529

CONWAY PUBLIC SCHOOLS                                  DEFENDANT

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

The Plaintiff Dauphine Nunn, an African-American female, has
sued the Defendant Conway Public Schools ("Conway") for race
discrimination and retaliation under 42 U.S.C. §§ 1981 and 1983,
claiming pay discrimination, discriminatory transfer, and failure
to hire.  Conway responds by claiming it has legitimate non-
discriminatory reasons for its actions, specifically that Nunn
was not performing her work and was causing friction with co-
workers in Conway's business office.  The Court conducted a bench
trial September 18-20, 2006.  The Court finds for Conway,
concluding Nunn was not discriminated or retaliated against on
the basis of her race.

### II.  FACTS

Conway hired Nunn as a full-time employee in 1995.  She
split time as a part-time secretary and as a part-time business
office clerk.  In 1996, she was transferred to a full-time
payroll clerk in the business office.  Several witnesses
testified the business office was in a small, cramped room and
the four employees that worked in the office shared space with

1

desks, office equipment, and filing cabinets.  At the time Nunn started in the business office, she had three white, female coworkers:  Payroll Clerk Evelyn Burnett, Payroll Clerk Alice Naylor, and Employee-Benefits Clerk Karen Black.  Burnett and Naylor were the stalwarts of the office, having worked there since 1978 and 1977 respectively.  In 1996, Black left Conway for a job in the private sector, and Diane Williams was hired to replace Black as the employee-benefits clerk.  In 1998, Burnett was named the Business Manager for the office.

In 1995, Arkansas adopted the Arkansas Public Schools Computer Network ("APSCN"), a new computer system that maintained records for the public school system.  Conway was chosen as a pilot program for APSCN.  Burnett and Naylor were selected to attend APSCN training.  The old methods used to process payroll were integrated with APSCN.  Eventually, all Conway business office staff were trained on APSCN.

Soon after Nunn started in the business office, her working relationship with Burnett and Naylor deteriorated.  Feuds developed between the three on how tasks should be completed. Williams testified Burnett and Naylor had been using the same methods for years and were firmly set on those methods, while Nunn believed she knew more efficient ways of completing the work.  Williams testified Nunn did not like taking instructions from Naylor.  Burnett and Naylor saw it as Nunn not doing her work.  For example, Naylor testified regarding the process the business office used to insure that every employee was receiving

a paycheck (the "check-off" method).  After the checks were
printed, the person stuffing the checks in envelopes checked off
each employee's name on a list.  Nunn testified she believed the
check-off method was an inefficient method of checking their work
and she had a better method.  Naylor, however, became frustrated
that Nunn was not doing her work.  Steve Fulmer, a former
superintendent and assistant superintendent at Conway, testified
he instructed Nunn to continue using the checkoff method as
Naylor had asked her in an attempt to resolve the situation.

While the working relationship between Nunn and Burnett and
Naylor was abrasive, the working relationship between Nunn and
Williams was good.  Diane Allen, the personnel director for
Conway and an African-American female, testified that Nunn and
Williams would meet with her to discuss how to improve the
business office.  One of the major concerns Nunn and Williams had
was the lack of cross training amongst the business office staff.
In their opinion, if someone was not able to work, business
office operations could be jeopardized.  Allen testified the
business office began cross training on some tasks at this time.

One of these tasks was the payroll balancing the business
office staff would complete each month to ensure the payroll was
correct, including the amount paid, time cards, and leave time.
After training was completed, the staff hoped to rotate the
balancing process on a monthly basis.  Burnett and Naylor began
training Nunn and Williams.  Williams testified Nunn had a
difficult time understanding the process.  For all the staff,

sometimes the final balance would not be correct, so each
employee checked the other's work.  Williams testified that when
either Nunn or she would make a mistake, Burnett and Naylor would
explain the mistake to both of them in the same manner.  However,
Nunn took offense to the extra attention given to her work,
believing she was being micro-managed.  Williams testified that
although she believed Nunn was capable of performing the work and
continued to help Nunn, Nunn never fully understood it, even
after six years of working with her.

In 2000, Burnett and Nunn were involved in a conflict.  Nunn
testified Burnett had returned from meeting with Allen.  Nunn
thought the two had talked about her suggestions for cross
training.  Nunn testified Burnett was angry and "off balance"
after the meeting.  Burnett said to Nunn something to the effect,
"I don't appreciate your black eyes following me."  Nunn
testified she understood the remark as racist and reported the
incident to Larry Scaife, Conway's director of student services
and equity coordinator and an African-American male.  Nunn and
Scaife reported the conflict to James Simmons, a white male who
was then assistant superintendent.  Simmons confronted Burnett
about the incident, and Burnett apologized to Nunn.  Nunn
testified she did not verbally accept the apology.

On September 11, 2001, Nunn addressed her concerns to the
Conway School Board.  Defendant's Exhibit #31 is a recording of
the meeting.  At the meeting, Nunn complained of "organizational
problems."  She stated the problems were more than the staff not

getting along and complained of a lack of communication, training, procedures, good management, direction, and teamwork. She also stated, "A lot of what's going on is just ignorance," and, "the conditions I feel have become so egregious due to ignorance and the lack of communications skills."  She also complained the Conway administration had failed her in resolving these issues.  Finally, she complained the problems had taken on a "racial tone," noting she was the only African-American employee in the office.  She argued that "she did not need to be led by the hand" and that her coworkers checking her work was a form of intimidation. She also referenced Burnett's "black eyes" remark and stated she believes she was being treated differently than her white co-workers when being assigned tasks and when taking time off.  After she completed her presentation, the Board went into executive session.  The Board formed a special committee to investigate Nunn's allegations.  Tyrone Scott, a board member and an African-American male, chaired the committee.

The special committee began investigating Nunn's complaints but discovered that she had not complied with Conway's grievance policy.  Conway's grievance policy was a progressive-step policy, requiring an employee to complain up the chain of command from the immediate supervisor to the school board (Pl. Exh. #12). Nunn testified at trial she did not follow the grievance policy. Scaife testified he suggested she follow the grievance policy when dealing with her issues, but despite this suggestion, Nunn never followed the grievance procedures.  The special committee

unanimously agreed taking any action would be premature until all proper grievance procedures were followed.  This decision was recorded in a memo to Superintendent Fulmer and he forwarded the memo and a copy of the grievance procedure to Nunn (Pl. Exh. #12).  Nunn never filed a formal grievance under the policy, and no followup investigation was conducted.  On October 18, 2001, Nunn filed an EEOC complaint alleging race discrimination (Pl. Exh. #1).  She claimed she was subjected to different terms and conditions of employment than her white coworkers.  Nunn testified that after she made her presentation to the school board and filed her EEOC complaint, her coworkers treated her more harshly.  Burnett, Naylor, and Williams disputed this, testifying they treated her no differently after the complaint and did not give Nunn's complaint much thought.

Also after the September 11 board meeting, Conway began restructuring the business office.  Superintendent Fulmer met with Assistant Superintendent Simmons and Burnett and concluded the business office needed more structural organization.  Simmons and Burnett were charged with creating an organizational chart of the business office and rewriting the job descriptions of the staff.  The organizational chart shows Burnett as the business manager (Pl. Exh. #11).  Burnett reported to Simmons as assistant superintendent.  Assigned to Burnett were four business office employees:  Naylor, Nunn, Williams, and Phoebe Church.  Church joined the business office in 1999 as an accounts-payable clerk. Naylor and Nunn were in charge of payroll.  Naylor was also

responsible for Conway's state reporting requirements.  Williams and Church were assigned additional duties.  In addition to Williams' existing employee-benefit duties, she was assigned to manage all of Conway's insurance responsibilities.  She also became the part-time secretary for Carroll Bishop, the new assistant superintendent who started in July 2002 when Fulmer left Conway and Simmons was appointed superintendent.  Church now managed all accounts payable, including the payables that had been handled at each individual school, which significantly increased her job responsibilities.  Nunn was not given additional responsibilities because she was most experienced in payroll and Williams and Church had more experience in benefits and insurance and accounts payable.

After Simmons and Burnett rewrote the job descriptions, they met with each employee to discuss the new description.  Simmons, Burnett, Allen, and Scaife met with Nunn in October 2001.  During the meeting, the five discussed Nunn's new job description (Def. Exh. #13).  Simmons and Allen testified that when they would ask Nunn a question, Nunn was non-responsive.  Finally, Simmons ordered Nunn to answer the questions asked of her with at least a "yes, sir" or "no, sir" answer.  Scaife testified he told Simmons that ordering an African-American female to respond "yes, sir" or "no, sir" could be perceived as racist.  Simmons, not agreeing with Scaife, did not apologize.  Ultimately, the meeting participants left with little progress made.

Also in October 2001, Nunn and Williams had a conflict.  A Conway teacher called Williams on her cell phone to complain about an error on her paycheck.  Williams concluded Nunn had given the teacher her phone number because Williams had not given the teacher her number.  This upset Williams, so she called Nunn.  Nunn denied giving out Williams' number, and the two argued on the phone.  After this argument, Nunn and Williams discovered that another person had given the teacher Williams' number.

The following Monday, Nunn emailed Burnett regarding the argument she had with Williams (Pl. Exh. #15).  Burnett showed Williams Nunn's email.  Williams became very upset and approached Nunn about the email.  The two began to argue, and Williams called Nunn a "sorry person."  A person in the lobby told Church he could hear two people arguing.  Church notified Simmons, and Simmons broke up the argument.  Simmons testified he had private meetings with Nunn and Williams and verbally reprimanded both.  Nunn testified she believed this was unfair and discriminatory because Williams started the argument.  While Williams testified about the argument, she appeared very ashamed and regretful.  She testified she considered her friendship with Nunn "a friendship gone bad."  On November 5, 2001, Nunn filed a second EEOC complaint claiming race discrimination and retaliation (Pl. Exh. #2).  She alleged she was racially discriminated and retaliated against when she was reprimanded for her conduct in the argument between Williams and Nunn.

Conway pays its employees on a index pay scale (Pl. Exh. #6-#10).  Employees start at a base salary.  That base salary is then multiplied by the appropriate index level for that specific job.  For example, Nunn's position in payroll was classified as a KA4 Administrative Secretary position with a pay index of 1.18.  The base salary is multiplied by the 1.18 index for her specific salary.  The base salary increases as the employee gains years of experience.  Merit raises are also available for each position, depending on job duties, increase in duties, and supervisor recommendations for raises.  For example in this lawsuit, Nunn claims that she was not given merit raises to either a KA5 Administrative Secretary, indexed at 1.23, or a KA6 Administrative Secretary, indexed at 1.45.  Williams started at 1.18.  Church started at 1.13 but received a raise to 1.18 after approximately one year of work to bring her to the same level as her coworkers.  In July 2002, when Williams took on additional insurance and secretarial duties, her index was raised to 1.45.  When Church was offered the additional accounts-payable duties, she requested and was granted a raise to 1.23.  Nunn remained at 1.18.  On December 6, 2002, she filed a third EEOC complaint alleging race discrimination and retaliation (Pl. Exh. #3).  She claimed she was racially discriminated and retaliated against when two white coworkers were given raises and she was not.

Nunn and her business office coworkers continued to have other conflicts.  In August 2002, Nunn had a radio turned on at her desk.  Naylor testified she asked Nunn to turn the radio down

because she was trying to concentrate on a task.  Nunn refused,
stating if she turned it down she could not hear it.  Burnett
reported the argument to Bishop.  Bishop sent a memo to Nunn,
stating he had learned of the incident, attempted to meet with
Nunn to discuss it, and she refused (Pl. Exh. 18).  The memo also
instructed Nunn to either reconcile her differences with her
coworkers or request a transfer and stated Conway would consider
transferring Nunn to the next lateral position that came open.

In March 2003, Nunn filed a race discrimination and
retaliation lawsuit (the lawsuit was later voluntarily dismissed
without prejudice).  On April 16, 2003, the payroll was in
jeopardy of not being completed.  Conway's employees are paid on
the 20th of each month.  The payroll had also been in jeopardy in
September 2002 and January 2003, although it was always completed
on time.  Possible causes for delay include an illness that
Naylor had been fighting and the payroll employees not timely and
harmoniously completing their work.  Simmons, in an attempt to
emphasize the urgency of a late payroll, sent a memo to Burnett,
Naylor, and Nunn (Pl. Exh. 19).  The subject of the memo stated
"Payroll," and the memo outlined the reoccurring problem.  The
memo also stated that if the payroll employees did not remedy the
problem, each could face disciplinary consequences such as
suspension or dismissal.  The memo addressed only the late
payroll issue and made no reference to any of Nunn's past
conflicts with her coworkers.  Burnett, Naylor, and Nunn each
were to sign their copy of the memo and return it to the

superintendent's office by 8:30 am.  Burnett and Naylor both
testified they were upset and nervous about the memo but signed
and returned it immediately.

Nunn testified that when she came into work that day, she
found an envelope on her desk, but she did not open it right
away.  Burnett walked to Nunn's desk and told her she needed to
open the envelope and read the memo.  Nunn testified that when
she opened the envelope and read the memo, she became nervous
because it discussed dismissal.  She left the office, went
outside, and sat in her vehicle for approximately forty-five
minutes.  When she returned to the office, Simmons, Burnett, and
Allen asked to meet with Nunn to discuss the memo and her
actions.  She refused, stating she wanted to talk to her lawyer.
Allen testified she implored Nunn to meet with them, and
ultimately, Simmons said that if she would not meet with them,
she would be suspended from work.  Nunn again refused to meet
with them and went home.  Simmons sent a certified letter to Nunn
informing her she was suspended with pay for three days for,
"Failure to maintain a professional and cooperative relationship
with other staff members," insubordination, and neglect of
duties.  She was ordered to return to work on April 21, and meet
with Simmons, Allen, and Bishop.  On April 21, Nunn filed a
fourth EEOC complaint alleging retaliation.  She claimed she was
retaliated against when she was suspended.

Over the next several days, Simmons and Scaife discussed
full-time secretarial assistance for Scaife.  Scaife had a part-

time secretary but stated in a memo to Simmons that he needed
extra secretarial assistance and provided a rationale to Simmons
for the full-time position (Pl. Exh. #23, #25).  When Nunn
returned to work the following week, she met with Simmons, Allen,
and Bishop.  She was presented with a memo documenting the events
of April 16 (Pl. Exh. 20).  She signed the memo as an
acknowledgment of Simmons', Allen's, and Bishop's account of the
April 16 incident.  She was also presented a memo stating she
would be transferred to Scaife's secretarial position.  She
accepted the transfer under protest because she felt, "such a
transfer restricts my future earing potential, career advancement
opportunities, as well as professional development training" (Pl.
Exh. 24).  Nunn's pay remained at a 1.18 index.  Allen testified
she saw the transfer as a business decision to remedy the
personality conflicts in the business office.  She hoped the
transfer would improve the environment in the office, help
Scaife, and help Nunn.  She testified Nunn's race did not
motivate Conway's decision to transfer Nunn in any way.

Ann Scott, Tyrone Scott's wife and an African-American
female, replaced Nunn in the business office.  Williams, Burnett,
Naylor, and Simmons testified no problems have arisen in the
business office since Scott started and work has been harmonious.
Nunn testified she enjoyed working for Scaife but believes the
position has diminished her career opportunities.  Scaife
testified Nunn was a hard worker who excelled as his secretary.
He was pleased with her work so much that he recommended her for

a merit raise in June 2004 (Pl. Exh. #28) and June 2005 (Pl. Exh. #26).  Neither of these recommendations was granted, but Simmons testified Nunn was already one of the higher paid director secretaries at a 1.18 index and a raise at that time would be inequitable unless Nunn was assigned additional duties.  He also testified that Nunn's pay index is not permanently fixed at 1.18, that she has the opportunity for merit raises if they were merited by a change in duties, and that "anybody can look at any job and say, that's a dead end job."  Scaife left Conway's employ in late 2005, and Nunn was reassigned to be the secretary for the director of the gifted and talented program.  She remains in that position today, although two different white females have been the gifted and talented director.

After Nunn was transferred, Conway created a new position within the business office titled General Accounting Clerk (Pl. Exh. #29).  Current employees and outside applicants were invited to apply for the position, and Nunn applied.  Conway's policy was to hire from within whenever possible.  L.C. Ramsey, an outside applicant and a white male, also applied for the position.  Allen testified Ramsey had twenty-six years of related experience and knew how to complete all the job duties listed on the position's job description.  Allen testified that although Nunn was interviewed, considered, and generally qualified for the position, she had no experience in several specific duties.  Therefore, the hiring committee unanimously decided that Ramsey, not Nunn, was the more qualified applicant to hire.

In June 2006, Naylor announced she would be retiring.  Lisa Jensen, a part-time accounts-payable clerk and white female, was transferred to payroll clerk to take Naylor's place.  This position was not posted to Conway employees, but precedent for transferring people into full-time positions exists because transfer was how Nunn and Scott became payroll clerks.

The Court makes the following characterizations of several witnesses and their credibility:

• Nunn is an intelligent, young, and ambitious woman.  While testifying, Nunn had a pleasant demeanor and was animated. Nunn seemed to stubbornly resist instruction or direction from supervisors.  She was unable to get along with coworkers because she has a low tolerance for completing tasks as assigned when she believed she had a better way to complete the tasks.  She had a difficult time learning the processes Conway used to complete its payroll.  She is a smart woman, but the processes Conway used did not come easily to her.

• Williams has a pleasant demeanor and is a hard and capable worker.  The Court finds she is very credible as she was relaxed during testimony, was Nunn's friend, and certainly has nothing to gain from this litigation.  Although she was a friend of Nunn's, she corroborated Conway's argument that Nunn did not understand the processes used in payroll.

• Naylor has a strong personality and is a competent and hard worker.  She is intolerant of any perceived incompetence,

14

regardless of the person's race, and resists changing how she has completes work, notwithstanding her success in working with the APSCN program.

- Burnett is a kind woman.  However, she also resists changing how she has completed work in the past, notwithstanding her success in working with the APSCN program.  Although she was a smart, dependable, and capable worker, she proved to be an ineffective leader who could not manage the personality conflicts that existed in the business office.  The Court did not detect Naylor and Burnett felt any racial animus toward Nunn, though neither seemed to like or respect Nunn.

- Simmons is a strong and capable leader.  The Court was impressed with his obvious abilities.  Fulmer and he faced the daunting task of following one of the most established educators in the country when Raymond Simon retired as the Conway Superintendent to become the Deputy Secretary of the Department of Education.  Simmons was justified in making the decisions he made.  He attempted to fix a personnel conflict, believing the problems were personality driven and not racially driven.  The Court finds his frustrations and concerns with the business office were justified, especially the situation in April 2003 when payroll was within three to four days of being late.

- Allen is a very direct and competent personnel director.  The Court finds she was very credible as her testimony was direct, specific, and unwavering.  She was involved in the

relevant disputes through every step and insists that race played no part in Conway's employment decisions.

• Scaife was a good friend to Nunn.  He is credible in that he no longer works for Conway and has nothing to gain from this litigation.  Interestingly, however, when the Court asked, "What was the reason or cause for the problems suddenly occurring in 2000 or do you know?," Scaife replied:

> Thereabout is when Ms. Burnett was interviewed and named business manager.  Ms. Burnett was named business manager without any training for supervisory training.  I think that had a lot to do with it.  Ms. Burnett was a hard working lady[,] a good lady[,] but she did not have supervision training from the administration. So I think that the administration failed her in that they did not prepare her to lead the bookkeeping department. . . .  And I fault the administration for not preparing her for that supervisory role because any of us who work in the superintendent's office[,] we've had certification or training in supervision, and there has to be certain strategies and skills used in working with employees and supervising employees so I feel she was done an injustice because she wasn't provid[ed] the training and supervision.

He made no reference to race as a factor.

## III. DISCUSSION

Nunn brings this suit under 42 U.S.C. §§ 1981 and 1983.

Section 1981(a) provides for equal rights to enforce contracts:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (2006).  Section 1981 protects against racial

employment discrimination and retaliation.  Johnson v. Ry.

Express Agency, Inc., 421 U.S. 454, 459-60 (1975).  Section 1983

provides for a private cause of action against state actors who

deprive another of a constitutional right:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress,
> . . .

42 U.S.C. § 1983 (2006).  Through the equal protection clause of

the fourteenth amendment, section 1983 prohibits government

entities from engaging in employment discrimination and

retaliation.  Hervey v. City of Little Rock, 787 F.2d 1223, 1233

(8th Cir. 1986).

**A.  Discrimination**

The inquiry for race discrimination based on circumstantial

evidence under sections 1981 and 1983 is the same, and the

primary focus is the employer's discriminatory intent.  Id. at

1231.  First, the plaintiff must present prima facie evidence

that (1) the plaintiff suffered an adverse employment action and

(2) the plaintiff's race was a motivating factor for the

defendant's decision.  MacGregor v. Mallinckrodt, Inc., 373 F.3d

923, 927-28 (8th Cir. 2004).  Once the plaintiff has met that

burden, the defendant has the burden of production to present

legitimate, non-discriminatory reasons for the employment decision.  Tex. Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The plaintiff then must prove the defendant's stated reasons are not the real reasons for the adverse action but are pretext for race discrimination.  Id.  The plaintiff always retains the burden of persuasion.  Id. at 256.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not."  Davis v. KARK-TV, Inc., 421 F.3d 699, 706 (8th Cir. 2005) (citing Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir.2005)).

First, Nunn argues Burnett's reference to her "black eyes" is direct evidence of discrimination.  However, not every racist remark made in the workplace supports an inference of discrimination, and a coworker's stray remark is not the same as remarks made by decision makers.  Arraleh v. County of Ramsey, 461 F.3d 967, 975 (8th Cir. 2006).  Burnett was the business manager and Nunn's first-line supervisor, but the Court finds she had no authority to hire, give raises, or transfer other employees, the actions Nunn complains of.  The school board, superintendent, and personnel director made those decisions. Furthermore, the comment was one, isolated event, made during an

argument when Burnett was frustrated.  The undisputed testimony
at trial was Burnett was a very kind and ethical person.  The
remark was also made at least one year before Nunn's speech to
the school board and approximately two years before her first
claimed adverse employment action.  Furthermore, Conway's
administration addressed the remark immediately and resolved it
through sincere apology.  The Court finds Burnett's "black eyes"
remark is not evidence of intentional employment discrimination.
Nunn's case is therefore based on circumstantial evidence.

     The first adverse employment action Nunn complains of was
not receiving raises that were given to similarly situated white
employees, namely Williams and Church.  To prove a claim of pay
discrimination, Nunn must show Conway paid employees of different
races different wages for equal jobs that required equal skill,
effort, and responsibility, and which were performed under
similar working conditions.  Tademe v. Saint Cloud State Univ.,
328 F.3d 982, 989 (8th Cir. 2003).

     Nunn, an African-American female, was paid less after
Williams and Church, both white females, were given raises in
2002.  Nunn's job as a payroll clerk, Williams' job as the
insurance and employee-benefits clerk, and Church's job as
accounts-payable clerk were equal in skill and effort in that all
were clerical in nature.  Furthermore, the responsibility each
had after the reorganization was equal because employee insurance
and benefits was an important aspect of completing payroll and
payroll, insurance, and accounts payable had to be calculated and

recorded properly or Conway risked the possible loss of a great deal of money.  Finally, the jobs were all performed under similar conditions because all were completed within the business office under many of the same deadlines.  Therefore, Nunn has met her first requirement under the burden-shifting approach.

However, Conway has presented legitimate, non-discriminatory reasons for its decision to give Williams and Church raises that Nunn has not proven are pretext.  As a result of the office reorganization that took place after Nunn spoke to the school board, Williams was assigned not only the employee benefits but also all other insurance obligations for the entire school district.  Williams, Allen, and Simmons testified these additional responsibilities greatly increased her work.  Therefore, Conway concluded a merit raise was appropriate.  Similarly for Church, she took over all accounts payable for the entire school district, eliminating the need for individual schools to manage their own accounts payable.  Church, Allen, and Simmons testified that these additional responsibilities greatly increased her work.  Therefore, Conway concluded a merit raise was appropriate.  In fact, since Church was given her raise, various people have been hired to assist her.

Unlike Williams and Church, Nunn did not see any increase in her duties.  She was a payroll clerk before and a payroll clerk after the office reorganization.  She was not offered the additional insurance and accounts-payable duties because her experience was in payroll.  Giving Williams the insurance and

Church the accounts payable made obvious business sense. Furthermore, Williams testified credibly that Nunn had never fully grasped different aspects of balancing and other payroll duties, so she likely would not have been able to manage any additional duties if she could not complete her original duties. Race was not a motivating factor of Conway's decision to give Williams and Church more responsibilities and pay. Nunn has not presented any evidence that Conway's reasons are pretext; she only claims that she was not given the opportunity. However, as explained, the reorganization did not present any new opportunities for Nunn. Her claim of pay discrimination fails.

The next adverse employment action Nunn complains of was her transfer from the business office to Scaife's secretary. Although her compensation and benefits were not reduced, the Court finds the transfer was an adverse employment action because she experienced a material change in her working conditions. She was completely removed from any business office or clerical duties and reassigned secretarial duties. Furthermore, Nunn testified the secretarial position does not allow her to exercise nor gain experience in her chosen career field of business, significantly affecting her future career prospects.

However, Conway has presented a legitimate, non-discriminatory reason for the transfer. The transfer was made to defuse the personality conflicts that had permeated the business office and to improve the teamwork in the office. The undisputed evidence was that the environment and morale in the business

21

office were poor.  Nunn had been unable to get along with Naylor
and Burnett for years.  For the third time in one academic year,
the payroll was in jeopardy of being late.  Even if Naylor's
illnesses contributed to the payroll problem, so did the
personality conflicts in the business office.  On April 16, 2003,
each payroll employee was given the payroll memo and warned of
consequences if the payroll was not finished.  Nunn was not
singled out in any way.  The reason Simmons and Allen were upset
with Nunn and not Burnett or Naylor was not because of her race,
but because Nunn never signed the memo as asked and refused to
discuss the problem with them.  Burnett and Naylor had complied
with their employer's request.  Allen, an African-American who
had been a professional friend of Nunn's, testified the
personality conflicts had been affecting the business office and
the transfer was an attempt to remedy the problem.  Race played
no part in the decision.  Particularly important to the Court's
finding that race played no part in the transfer is that Nunn's
replacement, Ann Scott, was also African-American.  The
undisputed evidence is that since Scott took Nunn's position, no
conflicts have arisen in the office.  Nunn has provided no
evidence that this claimed reason was pretext.  She was not
treated differently than either Naylor or Burnett.  She was the
logical candidate for transfer because Burnett and Naylor had
almost twenty more years of experience in payroll.  They helped
create the same processes that Nunn never fully grasped.  Nunn
was also close to and worked well with Scaife, the person who

needed the additional assistance.  The Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999). Conway's decision to transfer Nunn was to remedy a legitimate business concern, and Nunn's claim of discrimination fails.

Nunn alleges she was discriminated against because of her race and gender when she was not hired for the general accounting clerk position.  Nunn was generally qualified for the position, and the position was given to a white man, so Nunn has met her <u>prima facie</u> case.  But Conway has presented a legitimate, non-discriminatory reason for its decision that the Court finds was not pretext.  Ramsey had twenty-six years of related experience and knew how to do every responsibility listed on the job description.  Nunn, on the other hand, had approximately eight years of business office experience and did not know how to do every responsibility.  Allen testified Ramsey was by far the most qualified candidate the unanimous choice of the hiring committee.  Nunn's race played no part in the decision. Regarding Conway's policy to hire from within <u>whenever possible</u>, the Court finds Conway did not violate the policy because it is not required to ignore the most qualified candidate just because that candidate comes from outside the district.

Concerning Nunn's claim in her amended complaint that she was discriminated against on the basis of her gender when she

applied for the general accounting clerk position, the Court
finds this contention has no merit.  No evidence was presented
concerning gender discrimination other than the person hired was
a male.  In fact, females occupy most of the positions discussed
during the trial.  The entire trial concerned race discrimination
and no evidence of gender discrimination was presented.  The
Court finds Nunn's gender discrimination complaints regarding the
general accounting clerk position are without merit.

Lastly, Nunn claims she was discriminated against when
Conway transferred Jensen into the payroll vacancy Naylor's
retirement will create.  Although Conway knew Nunn was interested
in moving back into the business office and Jensen was
transferred into the position without it being posted to other
Conway employees, transferring part-time employees into full-time
positions is a common practice at Conway.  For example, Nunn
worked part-time in the business office before transferring there
full-time.  Ann Scott was transferred from a part-time position
to Nunn's full-time position when Nunn was transferred.
Furthermore, Conway has presented a legitimate non-discriminatory
reason for hiring Jensen rather than Nunn:  Nunn's personality
conflicts with others in the business office could reemerge if
she was transferred back into the business office.  Again, Nunn's
race was not a factor in Conway's decision.

Nunn's discrimination claims fail because she has not met
her burden of proof.  Nunn's personality conflicts with her
coworkers, her inability to fully grasp Conway's specific payroll

processes, and Burnett's ineffective leadership led to the problems and Conway's employment decisions, not her race.  The Court finds for Conway on Nunn's race discrimination claims.

**B.   Retaliation**

Nunn also claims she was retaliated against when she filed several EEOC complaints and when she sued Conway.  To maintain a claim of retaliation, the plaintiff must prove (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the two.  Tademe, 328 F.3d at 992.  The proximity of two events can be sufficient to establish a prima facie case of retaliation, but proximity alone is often insufficient to ultimately prove pretext for the employer's legitimate, nondiscriminatory reason. Arraleh, 461 F.3d at 977.

As evidence of retaliation, Nunn testified Fulmer kept a private file on her and excessively documented her work after she filed her first EEOC complaint.  However, Fulmer testified the file he kept was not exclusively for her but that he kept all EEOC complaints filed against the school as a means of record keeping.  The Court finds Fulmer's testimony is more credible than Nunn's because Nunn did not corroborate her testimony with any specific evidence of this file or its contents, other than she believes it existed.  Fulmer's explanation was specific and reasonable.  The Court finds Fulmer's method of keeping record of EEOC complaints is not evidence of retaliation.

Nunn claims she was retaliated against when she was not given the raises that Williams and Church received because she had filed two EEOC complaints.  Nunn has met the first two elements of a retaliation claim:  she engaged in protected activity when she filed her EEOC complaints and suffered an adverse employment action when she did not receive the same raise two white coworkers received.  However, she has failed to show the two were causally connected.  As discussed above, the reason Conway gave Williams and Church merit raises was because they received additional duties as part of the business office restructuring.  Nunn did not receive any additional duties, so she did not have any justification for a merit raise.  Her EEOC complaints, made eight months before Williams and Church were given raises, were not connected to the raise decisions.

Next, Nunn alleges her transfer to a secretarial position was in retaliation for filing her first lawsuit.  Again, Nunn meets the first two elements: she engaged in statutorily protected conduct by filing a lawsuit and suffered an adverse employment action by being transferred.  Furthermore, the proximity of the two is close, having occurred approximately three weeks from each other, unlike the pay retaliation claim.  However, this proximity alone is insufficient to dispel Conway's legitimate, non-discriminatory reason.  Nunn and her coworkers had experienced personality conflicts for approximately eight years.  The friction had grown so intense that it had affected the efficiency of the office and impacted the daily morale and

teamwork of the business office.   Conway's decision to transfer
Nunn was to remedy the problem.   Furthermore, Conway's
administration had referenced the possibility of a transfer in
August 2002 when Bishop sent Nunn a memo regarding the radio
volume conflict, long before she filed a lawsuit against Conway
(Pl. Exh. 18).   Her transfer was not in retaliation for her
lawsuit.

Finally, Nunn suggests that she was retaliated against when
Scaife's raise recommendations from 2004 and 2005 were not
granted and when she did not receive either of the two job
openings in the business office.   The Court finds each of these
actions was an adverse employment action.   However, for the
reasons discussed above regarding the two openings in the
business office, Nunn has not proven a causal connection.   Ramsey
was the most qualified person for the general accounting clerk
position, and Jensen received her position because transferring
Nunn back into the business office would have been illogical as
the personality conflicts could reemerge.   Regarding Scaife's
recommendations for a raise, Simmons testified Nunn was one of
the higher paid secretaries at a 1.18 index.   Giving her a raise
without any increase in responsibilities would have created an
inequity between her and other secretaries (Pl. Exh. #29).
Simmons testified, however, that he did not respond to Scaife's
2005 raise recommendation, one reason being this pending lawsuit.
While this is evidence of retaliation and a poor reason not to
respond to a request from an employee, Simmons' testimony was the

lawsuit was one reason he did not respond to the request.
Although the lawsuit may have been a reason he did not respond,
the Court finds the only reason she was not granted the request
is because she had not seen an increase in duties that would
merit a raise.

Nunn has proven that she engaged in statutorily protected
activities and suffered adverse employment actions, but she has
not proven a causal connection between the two.  She did not
receive the raises Williams and Church did because she was not
assigned any additional duties, so a raise was not merited.  She
was transferred in an attempt to reconcile the personality
conflicts within the business office.  She did not receive either
of the business office positions because she was not the most
qualified person, and transferring her back could reignite the
personality conflicts.  She did not receive a raise after being
transferred to Scaife because she was already well compensated
for the position and a raise was not merited.  The Court finds
for Conway on Nunn's retaliation claims.

**IV.  CONCLUSION**

This is a case of coworkers who had personality conflicts
and could not work together.  Poor leadership amplified the
problems.  However, race did not motivate any employment decision
Conway made.  Nunn appears to be excelling in her current
position as a director's secretary, and the Court is confident

she will continue to do so.  However, she has not met her burden of proof in this race discrimination and retaliation suit.

**V.    ORDER FOR JUDGMENT**

The Clerk of Court is **ORDERED AND DIRECTED** to enter **JUDGMENT** in favor of Defendant Conway Public Schools **DISMISSING, WITH PREJUDICE,** Plaintiff Dauphine Nunn's lawsuit.  The Defendant shall receive its costs and disbursements of this action.


**IT IS SO ORDERED.**

Dated this 1st day of November, 2006.


RODNEY S. WEBB, District Judge
United States District Court